IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ahmed El-Zayaty,                                             Case No. 3:04CV7487

        Plaintiff

   v.                                                        ORDER

The University of Findlay,

        Defendant

      This is a national race/origin/religion employment discrimination suit by a tenured professor in the College of Business at the University of Findlay. The plaintiff, Ahmed El-Zayaty, an Arab of Egyptian birth and Islamic religion, claims that due to his background and religion the University implemented several changes in his working conditions, including:

    1) removing plaintiff from a position as Director of the University's Masters of Business Administration program;

    2) not appointing him to a position as Director of International Students;

    3) appointing a less qualified professor to an administrative position within his department/academic discipline;

    4) changing his classroom teaching assignments; and

    5) depriving him of "distinguished titles" and failing to acknowledge his achievements in a fashion similar to that in which equivalent accomplishments by his peers were acknowledged.

      Pending is the University's motion for summary judgment. On review of the record, and viewing all disputed facts most favorably for the plaintiff, I conclude, that the plaintiff has failed to establish a *prima facie* case of actionable discrimination. In any event, even if plaintiff were able

to present a *prima facie* case, no rational trier of fact could find that the legitimate reasons offered by the University for the decisions about which plaintiff complains were pretextual.

Accordingly, for the reasons that follow, the University's motion for summary judgment shall be granted, and judgment shall be entered in its favor and against the plaintiff.

**Background**

After receiving undergraduate and masters degrees from Cairo University, plaintiff came to the United States, where he completed extensive graduate studies by gaining two further masters degrees and a Ph.D. in accounting and finance. After teaching elsewhere, plaintiff came to the University of Findlay in 1993. He is the only Arab Muslim in the College of Business.

Though tenured, plaintiff and the University contract annually for his services. Plaintiff's contract requires him to teach twelve course hours in the Fall Semester and twelve course hours in the Spring Semester.

From the time of plaintiff's arrival at the University, he and many other professors at the University have received "overload pay." This is additional compensation beyond a teacher's annual base contract salary. The amount of this additional income depends on the number of additional class hours taught, and is computed pursuant to a formula.

As a result of plaintiff's willingness to take on such additional teaching assignments, he has regularly added substantially to his total annual income from the University. According to the plaintiff, the University has historically provided the opportunity to earn overload pay as a device for keeping professors at the University.

In addition to overload pay earned by teaching additional classes, some professors have an opportunity to earn "supplemental pay," which is a stipend for performing administrative duties. The amount of such supplemental stipend is determined by the Vice President for Academic Affairs.

When first employed by the University, plaintiff was hired to teach undergraduate and graduate business administration classes. In 1998, plaintiff was designated the Director of the University's MBA Program, which had increased from about twenty-five students in 1993 to about 300 to 350 students in 1998. In his capacity as MBA Program Director, plaintiff instituted a program of instruction over the internet, and the MBA program continued its expansion in enrollment. By 2001, the program was recognized by U.S. News and World Report as one of the nation's premier online MBA programs.

Although the annual supplemental stipend for plaintiff's administrative work as MBA Director was relatively modest ($2-3,000/year for four years), plaintiff generated substantial additional overload pay by teaching a large number of additional classes:[1]

| Year | Base Comp. | Overload | Extra Hours. | Total Comp. |
| --- | --- | --- | --- | --- |
| 1998 | $61,911.98 | $120,415.36 | 151 | $182,327.34 |
| 1999 | 62,547.24 | 196,260.98 | 158 | 258,808.22 |
| 2000 | 69,371.00 | 194,366.54 | 160 | 263,737.88 |
| 2001 | 78,688.26 | 230,585.85 | 127 | 313,274.11 |
| 2002 | 85,228.20 | 207,857.69 | 127 | 297,085.89 |
| 2003 | 85,969.20 | 165,306.08 | 94 | 253,275,28 |
| 2004 | 88,548.00 | 133,001.88 | | 221,459.88 |

---

[1] The "Total Comp." amount in the table includes supplemental compensation for service as the Director of the MBA Program of $2,000 in 2000 and 2001 and $3,000 in 2002 and 2003.

When first employed by the University, plaintiff was hired to teach undergraduate and graduate business administration classes. In 1998, plaintiff was designated the Director of the University's MBA Program, which had increased from about twenty-five students in 1993 to about 300 to 350 students in 1998. In his capacity as MBA Program Director, plaintiff instituted a program of instruction over the internet, and the MBA program continued its expansion in enrollment. By 2001, the program was recognized by U.S. News and World Report as one of the nation's premier online MBA programs.

Although the annual supplemental stipend for plaintiff's administrative work as MBA Director was relatively modest ($2-3,000/year for four years), plaintiff generated substantial additional overload pay by teaching a large number of additional classes:[1]

| Year | Base Comp. | Overload | Extra Hours. | Total Comp. |
| --- | --- | --- | --- | --- |
| 1998 | $61,911.98 | $120,415.36 | 151 | $182,327.34 |
| 1999 | 62,547.24 | 196,260.98 | 158 | 258,808.22 |
| 2000 | 69,371.00 | 194,366.54 | 160 | 263,737.88 |
| 2001 | 78,688.26 | 230,585.85 | 127 | 313,274.11 |
| 2002 | 85,228.20 | 207,857.69 | 127 | 297,085.89 |
| 2003 | 85,969.20 | 165,306.08 | 94 | 253,275,28 |
| 2004 | 88,548.00 | 133,001.88 | | 221,459.88 |

---

[1] The "Total Comp." amount in the table includes supplemental compensation for service as the Director of the MBA Program of $2,000 in 2000 and 2001 and $3,000 in 2002 and 2003.

During the Spring of 2003, Douglas Asbury, another member of the Business College faculty, met with Ted Alex, Dean of the Business College. As summarized in plaintiff's brief in opposition to the motion for summary judgment,

> Mr. Asbury complained [to Dean Alex] that Plaintiff did not "have the right last name" and that people in "this town" and in "this community" do not like that fact that Plaintiff is Arab. According to Dr. Alex, Mr. Asbury went on to claim that he had a solution to the problem – place Mr. Asbury as Assistant MBA Director. Mr. Asbury suggested that he could take over the function of dealing with the American students, while Plaintiff could work with the International students.

Doc. 35 at 10 (Deposition citations omitted).

Rather than responding favorably to these comments and suggestion, Dean Alex verbally reprimanded Prof. Asbury. In addition, Dean Alex informed John Cindric, the Dean/Vice President of Academic Affairs, about Prof. Asbury's comments. Cindric approved the reprimand; thereafter, Alex met again with Prof. Asbury in the presence of the plaintiff and repeated his earlier reprimand to Prof. Asbury.[2]

In June, 2003, DeBow Freed became the University's President. He placed an emphasis on academics, and was known to disapprove of substantial excess teaching loads. Similar concerns had been expressed in the Faculty Senate, especially with regard to the Colleges of Education and Business. In September, 2003, President Freed appointed a Faculty Compensation Task Force to examine faculty compensation and overload issues. One member from each of the University's five colleges was appointed to the Task Force.

---

[2] Dean Alex also testified that he was told that other College of Business faculty were speaking negatively about Plaintiff's race, national origin and/or religion. He was told that Professor Skrabec referred to Plaintiff as an "Arab terrorist in charge of the MBA program." Doc. 35 at 10 n.6. None of these alleged statements is attributed to a decision maker whose decisions plaintiff challenges. Testimony about such statements is, in any event, hearsay, and cannot properly be considered.

4

The Task Force identified large course loads as a problem, and recommended hiring additional faculty and restricting overload teaching. These recommendations were submitted to and approved by the Faculty Senate on November 10, 2003.

Thereafter the University implemented a new overload compensation policy that placed an upper limit on the number of hours an instructor could teach, set new hourly reimbursement rates, and prohibited administrators from teaching overload classes.

Plaintiff does not contend that those newly-instituted compensation guidelines are not universally applicable to all faculty. The limit on overload hours had, however, its greatest impact on the faculties of the Business College and Education College, and a substantial individual financial impact on the plaintiff.

In November, 2003, concurrently with consideration of the overload compensation issue, Vice President Cindric and Dean Alex discussed administrative reorganization of the Business College. Shortly thereafter, at the direction of Vice President Cindric, who, in turn, was acting on instructions from President Freed, Dean Alex informed the plaintiff that he would no longer be the Director of the MBA Program. In plaintiff's view, he lost not just the modest administrative stipend of $3000; he also lost a "distinguished title" when he ceased being the Director of the MBA Program.

After notifying plaintiff that he was "out" as MBA Director, Dean Alex discussed possible successors to that position with Prof. Marty Carrigan, one of plaintiff's colleagues in the Business College. According to the plaintiff, Dean Alex suggested that Prof. Carrigan be considered for the position. But there is no evidence that the University sought applicants for the MBA Program Director's position. There is also no evidence that a person with authority to make such appointment

5

ever considered anyone, including Prof. Carrigan, for that position. Since plaintiff's removal the position of Director of the MBA Program has not existed.

Plaintiff contends further that Vice President Cindric offered him a position as "Director of International Student Affairs" in late 2003, and he accepted the offer. However, according to the plaintiff, the offer was withdrawn within a week or so after it had been made. Plaintiff complains that he lost the opportunity to earn supplemental compensation for performing additional administrative duties, and that he again lost a "distinguished title."

Although there is evidence that Vice President Cindric inquired of plaintiff if he would be interested in serving in such an administrative position and plaintiff responded affirmatively, there is no evidence that the University ever established such a position. Plaintiff claims others at the University are performing work that he would have performed in this administrative position. Whether that is so or not is immaterial: plaintiff's complaint is based on the alleged discriminatory withdrawal of an appointment that was never made to a position that was never created.

Moreover, plaintiff has submitted no evidence that he ever performed any additional administrative duties or claimed to be entitled to supplemental compensation for such work.

The plaintiff's remaining contention about administrative positions is a claim that in late 2004 Prof. Asbury was appointed to a "Director of Accounting" position within the College, though Asbury, unlike plaintiff, does not have a doctorate degree and is otherwise, according to plaintiff, less qualified than he.

In response to this contention, the University has produced evidence that the position is not as a "Director," involves modest administrative duties [and, I assume, a corresponding stipend], does not constitute a promotion in faculty rank or tenure status, and does not require specific academic

credentials or prestige. Most importantly, plaintiff has produced no evidence that he desired this appointment, or otherwise complained about not having received it before filing this lawsuit.

Plaintiff has also alleged that in his administrative position Prof. Asbury has reduced plaintiff's course load for the 2005 academic year. Plaintiff has not, however, produced any evidence sufficient to persuade a trier of fact that Prof. Asbury either took or had the authority to take classes from the plaintiff.

The record shows that plaintiff continues, despite the cap on overload compensation, to teach more classes and earn more pay than most of his colleagues. Indeed, defendant's reply brief points out that plaintiff has been scheduled to teach 65.31 out of a possible maximum of sixty-six hours during the current academic year. Doc. 39 at 22 n.11. Plaintiff may be earning less than in the past, but that fact does not distinguish him from his colleagues or they from him. And plaintiff appears to be earning almost as much as he can within the limits established under the overload cap.

Plaintiff also complains about the failure of the University to ensure that his photograph appeared in an issue of *Ohio* magazine that included plaintiff among the top 100 faculty members at Ohio's institutions of higher education. In addition, plaintiff alleges that University administrators provided indicia of appreciation for activities and accomplishments similar to his own to other faculty members, but not to him.

**Discussion**

Aside from the remarks attributed to Prof. Asbury that plaintiff did not have the right last name and about negative views in the community towards the plaintiff's ethnicity, there is no admissible direct proof of discriminatory animus on the part of anyone. Because the record is clear that Prof. Asbury, as plaintiff acknowledges and discussed below, is not a decision-maker with

regard to the events giving rise to this suit, plaintiff must, under the four-part test of *McDonnell Douglas Corp. v.* Green, 411 U.S. 792, 802 (1973), prove a *prima facie* case of discrimination indirectly by showing: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position; and 4) a person outside the protected class replaced him or he was treated differently from similarly situated employees outside the protected class. *See generally, Alexander v. Local 496, Laborers' Int'l Union of North Am.*, 177 F3d 394, 402-03 (6th Cir. 1999); *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for its adverse employment actions. *Alexander*, 177 F.3d at 403. If the defendant does so, the burden remains on the plaintiff to produce evidence sufficient to enable the trier of fact to find that it is more likely than not that the offered reason is not the true reason, but has been offered as a pretext to conceal discriminatory animus and intent. *Id*.

### A. No *Prima Facie* Case

It is apparent from the foregoing review of the undisputed facts, and viewing any disputed facts in plaintiff's favor, that plaintiff cannot establish a *prima facie* case of actionable discrimination as to any of the contentions.

#### 1. Administrative Appointments

First, with regard to the termination of his directorship of the MBA Program and denial of an appointment as Director of International Students, the undisputed evidence shows that neither of these positions exists. No one has replaced the plaintiff as Director of the MBA Program. There is every reason to conclude that termination of plaintiff's directorship was the result of institutional

reorganization initiated after a change in University presidents; and none to believe that the decision originated from any other motive, much less from discriminatory animus directed toward the plaintiff. His situation is analogous to that in which an employer has reduced its workforce in response to economic considerations. *See LaGrant v. Gulf and Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir.1984) ( "mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case").

With regard to the plaintiff's contentions about an "offer" of appointment as Director of International Students, it is likewise clear that no such position was created, and no such offer was made. At most, plaintiff was asked if he were interested *if* such position were put in place. Though he would have been interested in that position [and even went to the expense of obtaining business cards for himself with that title], the position was never created.

Here again, plaintiff cannot show that a member outside his protected group was favored. Moreover, he incurred no adverse employment consequence: his status as a tenured full professor remained unchanged. A disappointed expectancy does not, without more, give rise to an actionable claim of discrimination.

In sum, the only reasonable inference is that the University administration contemplated such position and decided not to establish it. Whatever its reasons may have been for that decision, plaintiff has not shown, and no rational trier of fact could find that those reasons include discriminatory animus toward the plaintiff.

Plaintiff likewise cannot meet his *prima facie* burden with regard to the appointment of Prof. Asbury to an administrative position in the Business College. Plaintiff has not shown that he sought the position, or even made his interest in it known prior to after Prof. Asbury's appointment. Had

he felt himself disfavored once the appointment was made, he could and should have made his desire for the position known. But he did not, and the University cannot be faulted, much less held to legal account, for not giving him a job that it did not know he wanted, and in which he expressed no interest until after filing this lawsuit.

An employee cannot complain about not getting a job for which he did not apply. *See Wanger v. G.A. Gray Co.*, 872 F.2d 142, 146 (6th Cir.1989) (plaintiff's failure to apply for an available position was fatal to his age discrimination claim); *Payne v. Bobbie Brooks, Inc.*, 505 F.Supp. 707, 716-17 (N.D. Ohio 1980) (plaintiffs who did not apply for a position with defendant failed to establish a *prima facie* case under the disparate treatment theory of Title VII).

### 2. Teaching Load and Compensation

There appear to be two branches to plaintiff's claim that discriminatory animus has led to a reduction of his teaching load and consequent reduction in his income: namely, the institution of the cap on overload teaching, and Prof. Asbury's alleged control over plaintiff's teaching assignments.

Plaintiff cannot prevail on his claim that the reduction of his excess teaching load was motivated by discrimination toward him. He acknowledges that the policy applies to everyone on the faculty. The core of a discrimination claim is different treatment; where persons have been treated similarly in all material respects, no discrimination can be found. *Alexander, supra*, *Alexander v. Local 496, Laborers' Int'l Union of North Am.*, 177 F.3d at 402-03; *cf. Bell v. South Delta Sch. Dist*. 325 F.Supp.2d 728, 741 (S.D.Miss. 2004) ("As a prerequisite to her equal protection claim, the plaintiff must prove that similarly situated individuals were treated differently").

Although the revised overload teaching policy may have had an adverse impact on plaintiff's income, he has not shown that impact is not the same as the policy's impact on other professors in his College. Plaintiff has not shown that others outside his protected class are teaching additional hours beyond the cap, while he is kept within it. Nor has he shown that others are teaching up to the cap, while he has sought and been denied the opportunity to teach an equivalent number of hours.[3] He thus cannot meet his burden of proving that members outside his protected group were or are being treated more favorably than he.

He likewise cannot prevail on his allegation that Prof. Asbury played an adverse role in his class assignments. As recited in plaintiff's brief in opposition to the University's motion for summary judgment, his claim with regard to Prof. Asbury is:

> Discriminatory statements can comprise direct evidence of discrimination, but they need to be made by the decision maker. *Syvongxay v. Henderson*, 147 F. Supp2d 854, 857 (N.D. Ohio 2001), quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Conner, J., concurring). Although, concededly, a large part of Plaintiff's claim *cannot be directly tied to Mr. Asbury's derogatory comments* regarding Plaintiff *because Mr. Asbury was not the decision maker*, Defendant's argument that Mr. Asbury did not make "any decision concerning any issue in this case," may not be entirely accurate. *Plaintiff testified that Mr. Asbury removed some of Plaintiff's course load* during 2005, in Mr. Asbury's new position of Director of Accounting. This was done without consulting with Plaintiff and harmed Plaintiff financially. Mr. Asbury testified that his job duties are unwritten. Because they are unwritten, *it is impossible to tell the extent of Mr. Asbury's power in making those types of decisions*. Hence, there is direct evidence, based on Mr. Asbury's previous comments concerning Plaintiff, that, *he could possibly have assisted in or solely removed these courses* with discriminatory intent.

Doc. 35 at 17-18 (emphasis supplied).

---

[3] Given the fact that, as noted, plaintiff will be teaching 65.31 of a possible maximum of sixty-six hours during the current academic year, any claim that others were allowed to teach a materially greater number of hours than he would be specious.

11

This claim fails for several reasons. First, plaintiff has not detailed the changes in his class assignments, much less their putative adverse employment impact.

Second, plaintiff has not shown that his change in class assignments differed in its effects from changes in the class schedules of his colleagues. Thus, he has not shown that he was disfavored in comparison with others.

Third, plaintiff has presented no proof that Prof. Asbury's administrative position could have affected plaintiff's class assignments or that Asbury did so. There is no evidence in the record about how class assignments are made and who makes those decisions.

Instead of evidence, plaintiff offers only speculation that Prof. Asbury "could possibly have assisted in or solely removed these courses." What one party thinks might "possibly" have occurred is not proof that it happened. *See Calhoun v. Honda Motor Co., Ltd.,* 738 F.2d 126, 131 (6th Cir. 1984) (where the "evidence never went further than to show that the claimed defect was a possible, not probable cause . . . [it] is insufficient to establish liability."); *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir.1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support" a triable factual inference). Even if plaintiff had shown what changes were made and their adverse impact, he has not shown that Prof. Asbury influenced those adverse changes.[4]

---

[4]

Plaintiff's proof of animus on Prof. Asbury's part is weak, and probably insufficient to find that Asbury, even if he controlled any aspect of plaintiff's working conditions, acted on the basis of animus. His statements to Dean Alex were ambiguous [relating to what others in the community thought and plaintiff's name not being "right"] and isolated. *See Gagné v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989) ("Case precedent clearly reflects that isolated and ambiguous statements,. . . .'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.'" ) (citations omitted). In addition, Prof. Asbury was appointed to his administrative position in late 2004. This was more than a year after his Spring, 2003, statements to Dean Alex. *See Horton v. Rick Weaver Buick, Inc*. 704 F.Supp. 611, 613 (W.D.Pa. 1989) ("While either of these incidents [in which defendant's owner referred to an employee as "a nigger lover"] could be interpreted as evidencing a discriminatory intent on the part of [the owner], they are greatly

### 3. Loss of Title; Failure to Acknowledge Achievements

Plaintiff claims that he lost one "distinguished title" [Director of MBA Programs] and was denied another [Director of International Students]. He also contends that others of like accomplishment had their contributions more extensively acknowledged by the University. These allegations do not give rise to a cognizable claim of discrimination.

### a. Loss of Title

The plaintiff claims that when he lost his position as Director of the MBA Program, he lost as well his "distinguished title." He also asserts that he lost another "distinguished title" when he was not give the position of Director of International Students.

Because plaintiff has not made a *prima facie* showing of discrimination in with regard to either the position he lost or the position that he did not get, this adverse consequence – loss of title – is not actionable.

Even if such loss were actionable, plaintiff has not shown that his standing in the University was in fact adversely affected as a result of the new administration's decisions about his administrative status. Absent such evidence, plaintiff's complaints about the loss of his self-described "distinguished titles" amount to no more than hurt feelings. Such do not give rise to an actionable claim of discrimination. *See Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist.*,

---

attenuated by the passage of 18 months or more before plaintiff's termination.").

Despite the weakness of plaintiff's proof of discriminatory animus, I have assumed, *arguendo*, that Asbury, if he had the opportunity to do so, would have acted on the basis of such animus. But even if plaintiff had shown that Asbury played a role in class assignments, the evidence shows that plaintiff is but a fraction of an hour short of teaching the maximum allowable hours. No harm, no foul – and no *prima facie* case against the defendant.

620 F.2d 362, 366 (2d Cir. 1980); *Prigmore v. Houston Pizza Ventures, Inc.,* 189 F. Supp. 2d 635, 643 (S.D.Tex. 2002).

Even if plaintiff's prestige was diminished as a result of President Freed's reorganization, so was that of others outside the protected group, including Vice President Cindric, Dean Alex, and Professor Mathern, all of whom, during President Freed's first year in office no longer continued to serve in their administrative positions. In addition, the Undergraduate Director position in the Business College and graduate and undergraduate director positions in the College of Education were also eliminated. His loss of title is no greater than theirs.

Plaintiff cannot, therefore, show that he was treated any differently than others who were similarly situated.

Plaintiff has, moreover, provided no evidence of discriminatory animus on the part of President Freed or anyone else who may have played a role in these changes in the organization of the College and University.

### b. Lack of Equivalent Acknowledgment

Plaintiff likewise has not shown a *prima facie* case with regard to his other claims of unequal treatment at the hands of the University. He has not shown who was responsible for failing to have his picture included in the *Ohio* magazine article, much less that such individual(s) harbored or acted on the basis of animus. Similarly, he has not presented proof of animus on the part of those who, he alleges, neglected to acknowledge his performance and accomplishments to the same degree as they recognized similar accomplishments on the part of others.

In any event, if those individuals, acting on the basis of discriminatory animus, meant to disparage or diminish plaintiff's achievements by not sending him letters of congratulation, such

unequal treatment is not cognizable. To be actionable, an adverse employment action must be *material*; "not everything that makes an employee unhappy" constitutes an adverse employment action under Title VII. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996).

Failing to provide a picture for a magazine article and send a private letter of commendation simply are not materially adverse employment actions.

### B. Reasons Not Pretextual

Although the University is entitled to dismissal on the basis that the plaintiff cannot prove a *prima facie* case of discrimination, it would also be entitled to summary judgment on the issue of pretext. Its explanation for the decisions about which plaintiff principally complains – the loss of the MBA Program directorship and reduction in his excess teaching load and related compensation – is straightforward: with a new University administration came institutional change and reforms.

Plaintiff's description of the changes and their rationale as "specious" (Doc. 35 at 20) is not well founded. He has not supported that contention by evidence that casts any doubt over the *bona fides* of the University's explanation for the actions giving rise to this suit.

Plaintiff, for example, has not shown that the University did not, in fact, make these transformations. Plaintiff has also failed to show that the University's implicit motivation, to take steps to reform its compensation structure and reorganize the administration in the Business College [and College of Education] was not its true motivation.

In sum, plaintiff has presented no evidence that the University made these changes on the basis of anything other than what a new administration believed to be in the institution's best interests.

The University, on the other hand, has presented evidence about the administrative changes, the process by which they were reached, and their uniform application on a University- and College-wide basis. In light of that evidence and the lack of any evidence from the plaintiff that these changes did not occur as and why they did, a rational trier of fact could only find in the University's favor on the issue of pretext.

## Conclusion

For the foregoing reasons, the University is entitled to summary judgment in its favor and dismissal of this suit.

It is, accordingly,

ORDERED THAT defendant's motion for summary judgment be, and the same hereby is entered in favor of the defendant and against the plaintiff.

So ordered.

                                                s/James G. Carr
                                                James G. Carr
                                                Chief Judge